Opinion issued July 8, 2004







            










In The
Court of Appeals
For The
First District of Texas
 

 
 
                                              NOS. 01-03-00380-CR     01-03-00381-CR
____________
 
NOVELL QUINTIN WOODS JR., Appellant
 
V.
 
THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 337th District Court
Harris County, Texas
Trial Court Cause Nos. 909704 and 928529
 

 
 
MEMORANDUM OPINION
          In two separate cases, which were tried together, the trial court found appellant,
Novell Quintin Woods Jr., guilty of the first degree felony offense of burglary


 and
the second degree felony offense of aggravated assault.


 The trial court then made
an affirmative finding that appellant had used a deadly weapon during the
commission of the aggravated assault, assessed appellant’s punishment at
confinement for 18 years in each case,


 and sentenced appellant accordingly, with the
sentences to run concurrently.
          In four points of error, appellant contends that the evidence was factually
insufficient to support his conviction for aggravated assault, the evidence was legally
and factually insufficient to support his conviction for burglary, and the trial court
erred in denying his motions for a new trial, which were filed in each case, without
first holding hearings on the motions.
          We affirm.
Factual Background
          Julia Dominguez testified that she had met appellant in 2000 and, although he
was married to another woman, they had begun a romantic relationship. Appellant
eventually moved into her apartment and lived with Dominguez until early April
2002, when she “thr[e]w him out” following an argument.
          On April 12, 2002, while Dominguez was spending the evening at her
apartment with her boyfriend, Charles Mulkey, her 10-year-old daughter, Amanda,
and Amanda’s 10-year-old friend, Courtney McRae, appellant knocked on the front
door of Dominguez’s apartment. When Dominguez looked through the “peephole”
in the door and saw appellant, she became alarmed and upset because she had not
invited appellant to come to her apartment that evening and she did not want
appellant to know that Mulkey was at her apartment because Mulkey hated appellant. 
While appellant stood outside the apartment, Dominguez called him on his cellular
telephone “to ask him to just go away so there would not be a confrontation between
him and [Mulkey].”
          Dominguez explained that, after Mulkey learned that appellant was outside the
apartment, Mulkey retrieved, from Dominguez’s bedroom, a .25 caliber handgun that
Dominguez had borrowed from a friend. Mulkey then told Dominguez, “I’m going
to get that MF [sic]. He’s got to go down.” Dominguez and Mulkey then struggled
over the gun, and Amanda yelled either “Stop!” or “No, Jackie, no!”


 During the
struggle, Dominguez noticed that the gun had “jammed,” but she did not know if it
had jammed during the struggle or sometime earlier.
          Appellant then broke down the door of Dominguez’s apartment, came into her
bedroom, “leaned across” the bed, and began fighting with Mulkey, who was on the
opposite side of the bed from the bedroom door. Although it was undisputed that,
during his intrusion into the apartment, appellant had stabbed Mulkey twice, had also
stabbed Dominguez in the stomach, arm, and shoulder, and had cut off part of
Dominguez’s ear, Dominguez testified that she did not see whether appellant had a
knife and did not recall being involved in the struggle. Dominguez explained that,
after she had seen appellant fighting with Mulkey, her next memory was of being in
the hospital and that she did not remember receiving any of the injuries that she had
sustained.
          When the State asked Dominguez whether she had given appellant “permission
to kick [her] door in,” Dominguez stated that she was confused by the question,
refused to answer, and then invoked her Fifth Amendment


 right not to testify. In
response to a question by appellant’s counsel concerning whether appellant had
entered the apartment with her consent, Dominguez responded, “I would say it would
be with it, because I believe he was trying to help us.”
          Dominguez further testified that, although she had known Mulkey for most of
her life, she had become “reacquainted” with him in June 2001, when they had begun
a romantic relationship. During their relationship, Mulkey had choked and hit
Dominguez and had threatened to kill her and to hurt appellant. Dominguez believed
that appellant was aware of Mulkey’s prior violence and threats because, prior to the
incident in question, appellant had gone with Dominguez when she had obtained a
protective order against Mulkey while he was in jail in San Antonio. Although the
protective order was in effect on the night of the stabbings, Dominguez admitted that
she had invited Mulkey to visit and to stay with her and, a day or two earlier, had
purchased and sent him a bus ticket so that he could travel to Houston to see her.
          McRae testified that she had gone to Dominguez’s apartment that day to spend
the night with Amanda and that she and Amanda were in Dominguez’s bedroom 
when appellant broke down the apartment door. When McRae saw appellant come
into the bedroom and stab Mulkey with a knife, she, out of fear, ran into the hallway
of the apartment and yelled for Amanda to come with her. McRae then saw
Dominguez run backwards out of the bedroom, with appellant following her. When
Dominguez reached the apartment’s patio door, McRae saw appellant stab her several
times and heard Amanda yell at him to stop. After McRae telephoned for emergency
assistance, appellant left, and McRae saw that Dominguez’s ear was “hanging off.” 
McRae further testified that, some time after the incident, either Amanda or
Dominguez had told McRae that Mulkey had threatened to kill appellant.
          Mulkey testified that, beginning in August 2000, he had lived with Dominguez
at her apartment for approximately one and one-half months. Mulkey moved out after
he and Dominguez “began having some complications” because of appellant’s
telephone calls to Dominguez’s apartment. Mulkey, who had been “on a monitor
situation,” then returned to San Antonio, turned himself in, and spent six months in
jail.


 Dominguez had visited Mulkey every Friday while he was in jail in San
Antonio. Although Mulkey admitted that, before his release, he had been served with
a protective order requiring him to stay away from Dominguez, he denied that he had
beaten or had threatened to kill Dominguez. After his release, Mulkey came to
Houston to stay with Dominguez because she had told him that she needed to see him.
          When Mulkey heard a knock on the apartment door on the evening in question,
he heard Dominguez “gasp.” Mulkey determined that appellant was at the door and
went to look for Dominguez’s gun in the bedroom. Mulkey explained that he had
intended to open the door and to tell appellant to leave, but when he retrieved the gun,
Dominguez and Amanda argued with him and told him that they did not want him to
get into any trouble. Mulkey then put the gun in his pocket and sat on the bed, and
Dominguez left the bedroom. A few minutes later, Mulkey heard a “big boom,” stood
up, and saw that appellant had kicked down the apartment door and was holding a
knife in his hand. Appellant then came into the bedroom and attacked Mulkey before
Mulkey could pull the gun out of his pocket. Mulkey testified that he was stabbed in
the chest and neck and was bleeding profusely. Appellant then left the bedroom, and
Mulkey heard him screaming, “I thought you loved me.” Mulkey did not see
appellant stab Dominguez or Amanda.
          Appellant then returned to the bedroom and told Mulkey, “When I come back,
I’m going to kill you.” As appellant turned and left the apartment, Mulkey tried to
shoot him with Dominguez’s gun, but the gun jammed. Mulkey then ran out of the
bedroom and saw Dominguez, Amanda, and McRae on the sidewalk outside the
apartment. Dominguez was lying on the ground, and Mulkey saw that she had been
stabbed three or four times and that part of her ear had been cut off.
          Appellant testified that he had gone to Dominguez’s apartment that evening to
talk and to try to “get back together” with her and that he did not know that Mulkey
was there. Appellant knocked on the door of the apartment, and, when no one
answered, he began to walk away. As appellant was leaving, Dominguez called him
on his cellular telephone. Dominguez sounded “nervous” on the telephone, and, after
appellant heard Amanda in the background yell, “No, Jackie, no,”


 appellant kicked
down the apartment door. Appellant explained that, at the time that he kicked down
the door, he was aware that Mulkey had previously threatened Dominguez and that
Dominguez had obtained a protective order against Mulkey. Although Dominguez
had not invited him into the apartment, appellant kicked down the door because he
believed that Mulkey was inside the apartment and was hurting Dominguez or
Amanda.
          Inside the apartment, appellant saw Mulkey and Dominguez fighting in the
bedroom. After Mulkey had pointed a gun at him, appellant pulled a knife out of his
pocket and attacked Mulkey. During his struggle with Mulkey, appellant heard
Dominguez tell him, “Novell, stop. Novell, please.” When asked whether he had
intentionally stabbed Dominguez, appellant testified, “Not to my recollection. I
mean, I was swinging, and I don’t know.” Appellant stated that he did not remember
stabbing Dominguez, hearing Amanda or McRae screaming, or leaving later to buy
beer. Appellant further testified that, not long after the stabbings, Dominguez and her
daughter had visited him in jail and that, while he was in jail awaiting trial, he and
Dominguez had discussed the idea of getting married.
          Houston Police Officer D. Cohen testified that, on April 12, 2002, while on
patrol, he was dispatched to investigate the disturbance at Dominguez’s apartment. 
Upon his arrival, Cohen spoke to a security guard and, based on the guard’s
description of appellant, Cohen located appellant at a nearby convenience store. 
Cohen arrested appellant as appellant was leaving the store with a beer in his hand. 
Cohen found a bloody knife in appellant’s back pocket and saw that appellant had
blood on his clothing.
          When Officer Cohen returned to the apartment to speak with Dominguez,
Amanda, and Mulkey, he saw “blood everywhere.” Amanda, who had a cut on her
hand and appeared to be upset, told Cohen what had happened at the apartment, and
he described her statement as follows:
She had stated that [appellant] had come to the house. He was
knocking on the door. Her mom kept telling him to leave, she didn’t
want to talk to him, and after a few minutes all of a sudden they hear the
door come crashing open, crash open.
 
She stated that [appellant] went in the room, started assaulting Mr.
Mulkey with a knife. The mother tried to stop the assault. He then
stabbed Julia. At that point she stated she tried to stop him from
assaulting her mother and he had pushed her out of the way, and I
believe at that point that’s when her hand had gotten cut. Then he had
stopped assaulting the mom and again came back and stabbed Mr.
Mulkey in the neck. At that point I believe she stated that her mother
had ran [sic] outside, with [appellant] following her. He had punched
her, knocked her to the ground, and at that point started stabbing her
outside the apartment.

          The State introduced into evidence Dominguez’s and Amanda’s medical
records from Ben Taub Hospital, where they had received medical treatment that
evening. Those records indicate that Amanda gave the following description of that
evening’s events to the hospital’s emergency room personnel:
[Amanda] describes [appellant]–41 yrs–maternal ex-boyfriend came to
home; was angry b/c mom was in communication [with] another ex-boyfriend “Jackie.” [Appellant] apparently knocked door down & began
stabbing “Jackie” and [Amanda]’s mom. [Amanda] notes she tried to
help mom & was stabbed in [left] hand & hit in [right] mandibular area.

          Sufficiency of the Evidence—Aggravated Assault
          In his first point of error, appellant argues that the evidence was factually
insufficient to support his conviction for the aggravated assault of Mulkey “because
the State failed to disprove that [appellant] assaulted [Mulkey] in self-defense.” A
person commits the offense of aggravated assault if the person intentionally or
knowingly causes bodily injury to another by using a deadly weapon. Tex. Pen.
Code Ann. § 22.02(a) (Vernon Supp. 2004). Appellant concedes that he
intentionally stabbed Mulkey, but he contends that his conduct was immediately
necessary to protect himself or Dominguez from Mulkey.
          Self-defense and defense of third person are classified as “defenses” to
prosecution. See Tex. Pen. Code Ann. §§ 2.03, 9.02, 9.31, 9.33 (Vernon 2003). 
Once a defendant produces some evidence that supports a defense, the State then
bears the burden of persuasion to disprove the defense. Zuliani v. State, 97 S.W.3d
589, 594 (Tex. Crim. App. 2003). “The burden of persuasion is not one that requires
the production of evidence, rather it requires only that the State prove its case beyond
a reasonable doubt.” Id. A guilty verdict constitutes an implicit finding by the fact
finder against the defensive theory of self-defense. Id. When a defendant challenges
the factual sufficiency of the rejection of a defense, the reviewing court reviews all
of the evidence in a neutral light and asks whether the State’s evidence taken alone
is too weak to support the finding and whether the proof of guilt, although adequate
if taken alone, is against the great weight and preponderance of the evidence. Id. at
595. As the Court of Criminal Appeals has recently stated:
There is only one question to be answered in a factual-sufficiency
review: Considering all of the evidence in a neutral light, was a jury
rationally justified in finding guilt beyond a reasonable doubt?

Zuniga v. State, No. 539-02, slip op. at 8, 2004 WL 840786 at *7, (Tex. Crim. App.
Apr. 21, 2004) (footnote omitted).
          In a factual sufficiency review, we may not substitute our own judgment for
that of the fact finder. Jones v. State, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996). 
The fact finder is the exclusive judge of the facts, the credibility of the witnesses, and
the weight to be given to the witnesses’ testimony, and the fact finder may believe all,
some, or none of any witness’s testimony. See Sharp v. State, 707 S.W.2d 611, 614
(Tex. Crim. App. 1986); Jaggers v. State, 125 S.W.3d 661, 672 (Tex App.—Houston
[1st Dist.] 2003, no pet.).
          The Penal Code provides that “a person is justified in using force against
another when and to the degree he reasonably believes the force is immediately
necessary to protect himself against the other’s use or attempted use of unlawful
force.” Tex. Pen. Code Ann. § 9.31(a). A person may justifiably use deadly force
against another (1) if he would be justified in using force against the other under
section 9.31, (2) if a reasonable person in the actor’s situation would not have
retreated, and (3) when and to the degree the actor reasonably believes that the deadly
force is immediately necessary to protect himself against the other’s use or attempted
use of unlawful deadly force or to prevent the other’s imminent commission of
aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery,
or aggravated robbery. Id. § 9.32(a).
          A person may also justifiably use deadly force against another to protect a third
person if, under the circumstances as the actor reasonably believes them to be, the
actor would be justified under sections 9.31 or 9.32 in using force or deadly force to
protect himself against the unlawful force or unlawful deadly force that he reasonably
believes to be threatening the third person whom he seeks to protect and if the actor
reasonably believes that his intervention is immediately necessary to protect the third
person. Id. § 9.33. A “reasonable belief” is defined as one that would be held by “an
ordinary and prudent man in the same circumstances as the actor.” Id. § 1.07(42)
(Vernon Supp. 2004).
          Appellant argues that he was justified in defending himself and Dominguez
from Mulkey because he reasonably believed that Mulkey had threatened them with
a gun. He notes that Dominguez and McRae confirmed that Mulkey had been a
previous threat to Dominguez and that Dominguez “corroborated the fact” that
Mulkey pointed a gun at appellant prior to the stabbing. Appellant asserts that retreat
was not a reasonable alternative because, by the time that he saw the gun, he was
already inside the apartment and was “fearful for Ms. Dominguez’s safety.” 
Moreover, he notes that Mulkey’s testimony was not credible because of his
“numerous prior felony convictions,” his attempt to hide the gun from police officers,
contradictions between his testimony and that of other witnesses, and his motive to
lie—implicating himself in committing another felony offense.
          Appellant testified that, based on his knowledge of Dominguez’s violent prior
relationship with Mulkey and on Amanda’s scream that he heard on his telephone, 
appellant kicked down the apartment door because he believed that Mulkey was
inside the apartment and was hurting either Dominguez or Amanda. Appellant
explained that, once inside the apartment, he saw Mulkey and Dominguez fighting, 
he stabbed Mulkey only after Mulkey had pointed a gun at him, and he did not
remember stabbing Dominguez.
          Dominguez testified that, as she was talking to appellant on the telephone to
ask him to leave, Mulkey found out that appellant was outside, got Dominguez’s gun
from her bedroom, and threatened to kill appellant. Dominguez further testified that,
when she and Mulkey struggled for the gun, Amanda yelled “Stop!” or “No, Jackie,
no!” Despite the fact that she was stabbed several times, Dominguez testified that she
could not remember whether she had seen appellant holding a knife.
          In contrast, Mulkey testified that he had been sitting in Dominguez’s bedroom
with the gun in his pocket when appellant kicked down the door of the apartment and
attacked him with a knife. Mulkey heard appellant yell at Dominguez, “I thought you
loved me.” Mulkey further testified that he had not pointed the gun at appellant until
after appellant had stabbed Mulkey and Dominguez and as appellant was leaving the
apartment. Moreover, Officer Cohen testified that Amanda had told him that, after
her mother had asked appellant to leave, appellant kicked the door down and then
started stabbing Mulkey. When her mother tried to stop appellant, Amanda saw him
stab her mother. Amanda also told Cohen that appellant had later followed her
mother outside the apartment and had punched her, knocked her down, and stabbed
her again. McRae also testified that she saw appellant chase Dominguez across the
apartment and stab her several times.
          With regard to appellant’s contention that he stabbed Mulkey in self-defense,
appellant and Mulkey presented differing versions of events in their testimony
concerning whether Mulkey had pointed the gun at appellant before appellant stabbed
him. Although Dominguez testified that Mulkey had threatened to shoot appellant
with the gun, Dominguez did not testify that Mulkey had ever pointed the gun at
appellant inside the apartment. McRae testified that she had not seen Mulkey point
a gun at appellant before appellant stabbed him, but also testified that either
Dominguez or Amanda had later told her that Mulkey had threatened to shoot
appellant with the gun. Moreover, appellant’s argument that he stabbed Mulkey
while acting in the defense of Dominguez and Amanda was undercut by the testimony
and photographic evidence presented at trial that appellant stabbed Dominguez, both
in another room and outside the apartment, several times after he had stabbed
Mulkey.
          The trial court, as the fact finder, was entitled to resolve these conflicts in the
evidence against appellant. Jones, 944 S.W.2d at 647. Faced with different versions
of the events that took place inside the apartment that evening, the trial court simply
chose not to believe appellant’s testimony that he had acted in defense, either of
himself, Dominguez, or Amanda, when he stabbed Mulkey. In regard to Mulkey’s
credibility, we note that the trial court, as fact finder, was free to believe all, some, or
none of any witness’s testimony. See Sharp, 707 S.W.2d at 614. In regard to
appellant’s challenge to the factual sufficiency of the trial court’s rejection of his
claims of self-defense and of defense of third persons, viewing all of the evidence in
a neutral light, we hold that the evidence of guilt, taken alone, was not too weak to
support appellant’s conviction for the aggravated assault of Mulkey and that the proof
of guilt was not against the great weight and preponderance of the evidence. See
Zuliani, 97 S.W.3d at 595. Accordingly, we hold that the evidence was factually
sufficient to support appellant’s conviction for the aggravated assault of Mulkey.
          We overrule appellant’s first point of error.
Sufficiency of the Evidence—Burglary
          In his second and third points of error, appellant contends that the evidence was
legally and factually insufficient (1) to prove that he entered Dominguez’s apartment
without her effective consent and (2) to refute his defense that he entered the
apartment out of necessity to protect Dominguez.
          In reviewing the evidence on legal sufficiency grounds, we view the evidence
in the light most favorable to the verdict to determine whether any rational trier of
fact could have found the essential elements of the offense beyond a reasonable
doubt. King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).
          Necessity, like self-defense and defense of a third person, is a “defense” to
prosecution. Tex. Pen. Code Ann. §§ 2.03, 9.02, 9.22 (Vernon 2003). As noted
above, the State bears the burden of persuasion to disprove such a defense, which
“requires only that the State prove its case beyond a reasonable doubt.” Zuliani, 97
S.W.3d at 594. In regard to appellant’s challenge to the factual sufficiency of the
evidence to support the rejection of his defense of necessity, we review all of the
evidence in a neutral light, and we ask whether the State’s evidence, taken alone, is
too weak to support the finding and whether the proof of guilt, although adequate if
taken alone, is against the great weight and preponderance of the evidence. See id.
          A person commits the offense of burglary if, without the effective consent of
the owner, the person (1) enters a habitation with the intent to commit an assault or
(2) enters a habitation and commits an assault. See Tex. Pen. Code Ann. § 30.02
(Vernon 2003). A property owner’s lack of consent to the entry may be inferred from
circumstantial evidence. See Schenk v. State, 652 S.W.2d 509, 510 (Tex.
App.—Houston [1st Dist.] 1983, pet. ref’d). In regard to necessity, conduct that is
otherwise criminal is justified if (1) the actor reasonably believes that the conduct is
immediately necessary to avoid imminent harm; (2) the desirability and urgency of
avoiding the harm clearly outweigh, according to ordinary standards of
reasonableness, the harm sought to be prevented by the law proscribing the conduct; 
and (3) a legislative purpose to exclude the justification claimed for the conduct does
not otherwise plainly appear. Tex. Pen. Code Ann. § 9.22.
          In support of his legal sufficiency challenge, appellant asserts that Dominguez
stated that he did not need consent to enter her apartment when he believed that she
was in danger. However, viewing the evidence in the light most favorable to the trial
court’s finding of guilt, we note that appellant admitted that Dominguez had not
invited him into the apartment before he kicked down the door and forced his way
inside. Dominguez testified that, one or two weeks earlier, she had thrown appellant
out of her apartment, and she admitted that, when appellant knocked on her door that
night, she did not invite him into her apartment because she wanted to avoid a
confrontation between him and Mulkey. Moreover, there is ample evidence in the
record that after he entered the apartment, appellant, did not “protect” Dominguez. 
Rather, he inflicted serious stab wounds to both Mulkey and Dominguez. In fact,
McRae testified that she saw appellant chase Dominguez across the apartment and
stab her several times. Accordingly, we hold that the evidence was legally sufficient
to support the trial court’s finding that appellant entered Dominguez’s apartment
without her effective consent and the trial court’s rejection of appellant’s defense that
he entered the apartment out of necessity to protect Dominguez.
          Appellant argues that the evidence was factually insufficient to support his
burglary conviction because Dominguez testified that she consented to his entry of
her apartment “under the circumstances” and because there “was more evidence” to
support his necessity defense “than there was to defeat it.” He asserts that the
evidence established that Mulkey was a “potential threat” to Dominguez and that
Mulkey “grabbed” the gun prior to appellant’s entrance into the apartment. In
support of his factual sufficiency challenge, appellant relies on (1) Dominguez’s
refusal to answer the State’s question as to whether she had given permission to
appellant to kick down the door of her apartment and (2) Dominguez’s testimony that
she felt that appellant had entered the apartment because he was “trying to help” her
and Amanda. 
          However, the trial court, as the fact finder, was entitled to weigh the credibility
of Dominguez’s testimony in light of her reluctance to answer the State’s questions,
inability to remember details of the events, and apparent reconciliation with appellant
prior to trial. See Sharp, 707 S.W.2d at 614; Jaggers, 125 S.W.3d at 672. Moreover,
the trial court also heard evidence that appellant had gone to Dominguez’s apartment
to try to “get back together” with her, after having been recently forced to move out,
and that he was surprised to find Mulkey staying with her. Mulkey testified that, after
appellant forced his way into the apartment, appellant had yelled at Dominguez, “I
thought you loved me” as he chased and then stabbed her several times. The record
thus supports a finding that appellant entered the apartment out of jealousy, without
Dominguez’s consent, to assault Mulkey and Dominguez, rather than to “protect”
Dominguez. In regard to appellant’s challenge to the factual sufficiency of the trial
court’s finding that appellant had entered Dominguez’s apartment without her
effective consent and the trial court’s rejection of appellant’s necessity defense,
viewing all of the evidence in a neutral light, we hold that the evidence of guilt, taken
alone, was not too weak to support appellant’s burglary conviction and that the proof
of guilt was not against the great weight and preponderance of the evidence. See
Zuliani, 97 S.W.3d at 595. Accordingly, we hold that the evidence was factually
sufficient to support appellant’s conviction for burglary.
          We overrule appellant’s second and third points of error.
Motions for New Trial
          In his fourth point of error, appellant contends that the trial court erred in
denying, without a hearing, the motions for new trial that he filed in each case. In his
motions for new trial, appellant argued that the trial court erred in denying his pretrial
request to withdraw his waiver of his right to trial by jury in each case.
          A defendant is entitled to a hearing on a motion for new trial if the motion and
any accompanying affidavits raise matters, not determinable from the record, upon
which the defendant could be entitled to relief. Wallace v. State, 106 S.W.3d 103,
108 (Tex. Crim. App. 2003). To be sufficient to entitle the defendant to a hearing,
the motion for new trial and any accompanying affidavits must indicate that
reasonable grounds exist for holding that such relief could be granted. Martinez v.
State, 74 S.W.3d 19, 21-22 (Tex. Crim. App. 2002). The purpose of the hearing is
to give the defendant an opportunity to develop fully the matters raised in his motion. 
Id. at 21. If the trial court denies a hearing on the motion for new trial and the
defendant appeals from that denial, the appellate court must review the trial court’s
decision for abuse of discretion. Wallace, 106 S.W.3d at 108.
          Here, prior to trial, and in accordance with the State’s agreement not to seek
punishment of confinement for more than 20 years in each case in the event of a
conviction, appellant’s court-appointed counsel filed a waiver of appellant’s right to
a jury trial in each case. The following day, and while appellant was still represented
by counsel, appellant filed pro se motions to withdraw his waiver of his right to a jury
trial in each case. As noted above, the cases were subsequently tried to the bench
together. Following his conviction, appellant filed motions for new trial in each case,
arguing that, prior to trial, the trial court should have granted his withdrawal of his
waiver of the right to a jury trial. Appellant argues that the trial court was required
to hold a hearing on his motion for new trial “to establish whether there was a finding
that the withdrawal [of appellant’s waiver of a jury trial] would have resulted in an
unreasonable delay, or impedance of justice, or prejudice to the State, or
inconvenience to witnesses.”
          The record indicates that appellant’s pro se motions to withdraw his waiver of
the right to a jury trial were never presented to the trial court for a ruling, either
before or at any time during trial. Nevertheless, the trial court was not required to
consider appellant’s pro se pretrial motions because, at the time that they were filed,
appellant was already represented by court-appointed trial counsel. There is no right
to hybrid representation. Rudd v. State, 616 S.W.2d 623, 625 (Tex. Crim. App.
1981); McKinny v. State, 76 S.W.3d 463, 478 (Tex. App.—Houston [1st Dist.] 2002,
no pet.). Thus, appellant’s motions for new trial did not show the existence of
reasonable grounds for holding that the requested relief could be granted. See
Martinez, 74 S.W.3d at 21-22. Moreover, the record indicates that appellant’s
waivers of his right to a jury trial were made in accordance with an agreement that he
had made with the State concerning its request for punishment in the event of a
conviction—an agreement that the State kept and that the trial court followed in
assessing appellant’s punishment at confinement for 18 years in each case.
          Accordingly, we hold that the trial court did not abuse its discretion in denying
appellant’s motions for new trial. See Wallace, 106 S.W.3d at 108.
          We overrule appellant’s fourth point of error.
Conclusion
          We affirm the judgments of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Nuchia, Jennings, and Keyes.

Do not publish. Tex. R. App. P. 47.2(b).