Opinion issued June 16, 2005


















In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00024-CR
____________

KYLE ADAM CAUDILL, Appellant

V.

THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 232nd District Court
Harris County, Texas
Trial Court Cause No. 953949
 

 
 
MEMORANDUM OPINION
             A jury found appellant, Kyle Adam Caudill, guilty of the offense of failure to
stop and render aid


 and, after finding true the allegation in one enhancement
paragraph that appellant had a prior conviction for the felony offense of burglary of
a habitation, assessed appellant’s punishment at confinement for 10 years and a fine
of $5,000. In his sole point of error, appellant contends that the evidence was
factually insufficient to support his conviction. We affirm.
Factual Background
            Tanya Teer, the first complainant, testified that, on May 17, 2003, at about
11:30 p.m., she was a passenger in an F-150 truck owned and driven by Susan
Henderson. The F-150 truck was towing a trailer that carried two tied-down four-wheel-drive vehicles. After Henderson turned her truck onto Aldine Westfield street,
another vehicle struck the F-150 truck from behind, causing Teer to strike her head
and shatter the truck’s rear windshield and one of the four-wheeled vehicles from the
trailer to project into the bed of the truck. 
          Immediately after the crash, Teer thought that Henderson was dead because
Henderson was non-responsive. Teer then looked past Henderson and saw a “two
door gray Dodge like dark gray car,” and a “white and like maroon or reddish Dodge”
truck parked in a gas station’s parking lot located on Aldine Westfield street. Teer
explained that, when the F-150 truck was hit, she had seen the red-and-white Dodge
truck pass the F-150 truck on her right and then “turn into the same parking lot that
the car turned into.” Teer noted, however, that she did not actually see either the gray
Dodge car or the red-and-white truck turn into the gas station’s parking lot. Teer saw
a man exit the driver’s side of the gray Dodge and get into the red-and-white truck
that was parked behind the gray Dodge. The red-and-white truck then drove away
from the scene, leaving the gray Dodge parked in the parking lot. Teer stated that the
windshield and the front-end of the gray Dodge were crushed. She then described the
driver of the gray Dodge as having blond hair, and, although she explained that she
could not remember exactly what he looked like, she could “picture him.” She later
made an in-court identification of appellant as the person who had exited the gray
Dodge and then left the scene in the red-and-white truck. 
          Teer further testified that, after a call was made for emergency assistance,
Precinct Four Deputy Constable Elkins arrived, and Teer described to him the person
who had driven the gray Dodge that had hit the F-150 truck. On May 18, 2003, the
next evening, she received a telephone call from Elkins, who asked her to meet him
in a neighborhood subdivision that night to possibly identify the person who had left
the scene of the accident after hitting the F-150 truck. She agreed, and another
deputy constable drove her in his patrol car to where Elkins and appellant were
standing by another patrol car. From inside the patrol car, after observing appellant,
she identified appellant as the person who had driven the gray Dodge that had left the
scene after hitting the F-150 truck. 
          Henderson, the second complainant, testified that, as she was driving on Aldine
Westfield street, she felt something hit the back of her F-150 truck twice. She then
“saw a glimpse of lights go around” the F-150 truck on her left and saw the car’s
“headlights” go into the gas station’s parking lot. Henderson explained that the car
that passed her was “a Dodge Stratus or something” and that it was “like a two door
sporty looking car.” She explained that she knew that the car that had passed her was
the same car that had struck her F-150 truck because “she saw it,” that “the license
plate of the vehicle was imbedded into the back of the trailer” and that “the tags and
stuff all matched the vehicle that was parked there in the store.” Immediately after
the crash, Henderson saw a man exit the Dodge Stratus, get into a “Dodge Dooley
truck,” and leave the scene. Although she “saw a glimpse” of the person driving the
car that had struck the F-150 truck, she could not identify him because she had been
in shock. 
          Deputy Elkins testified that, after he was dispatched to the collision scene, he
saw that the F-150 truck’s “trailer was shoved up in the back of the truck” and that
a nearby silver- or champagne-colored 2003 Dodge Stratus had extensive front-end
damage. He then spoke with Teer, who told him that the damaged Dodge Stratus had
hit the F-150 truck. She then described the driver of the Stratus as “a young male,
[with] light colored hair [and] with numerous tattoos on him.” Elkins explained that
the description was, in fact, consistent with appellant’s appearance. Elkins also
explained during cross-examination that, although he did not write it down in his
report, he remembered that Teer described the driver as having numerous tattoos. 
After finding the Stratus’s license plate embedded in the F-150 truck’s towed trailer,
Elkins “ran” the license plate number and determined that appellant owned the
Stratus. He noted that the Stratus showed no signs of forced entry, that its steering
column was intact, and that there was nothing else about the Stratus that indicated
that it had been stolen. 
          Elkins further testified that, on May 18, 2003, at around 8:45 p.m., appellant
called Elkins and that they arranged to meet in the Barnham Wood subdivision later
that night. At the meeting, appellant told Elkins that appellant’s car had been stolen. 
However, appellant also told Elkins that he remembered leaving a friend’s house,
approximately two miles from the collision scene, driving down Aldine Westfield
street, and then parking his car in the gas station’s parking lot, where it had been
found. Appellant also told Elkins that “he may have been driving the vehicle when
the accident occurred” and that he did not remember the accident. Elkins explained
that, meanwhile, Elkins had requested that Precinct Four Deputy Constable W.
Stensland pick up Teer and bring her to the location where Elkins was meeting with
appellant. While inside Stensland’s patrol car, Teer told Stensland that appellant was
the driver of the car that had hit the F-150 truck. Elkins stated that bringing Teer to
his meeting with appellant was “the most convenient way” to complete the
investigation. 
          Deputy Stensland testified that, on May 18, 2003, at about 5:06 a.m., while
performing routine patrol duties, he saw appellant and another man walking down a
street in the Barnham Wood-and-Fairfax subdivision, approximately three or four
miles from the collision scene. Appellant was wearing blue jeans but no shirt,
appeared “agitated” and “upset,” and was “uncooperative.” Stensland also noticed
a two-inch laceration below appellant’s left eye. While Stensland searched appellant
for weapons, appellant said, “don’t fuck with me. I don’t have time for this shit.” 
When Stensland asked appellant why he was upset, appellant replied that he had been
at Spring Creek “drinking a few beers with his friends and [that] some unidentified
people jumped on him, fought with him and then took his car.” Stensland then asked
appellant for his car’s license plate number in order to report a vehicle theft, but
appellant stated that he did not know his license plate number and that he would
contact Stensland later. Because Stensland did not have any information to justify
further detaining appellant, Stensland let appellant leave. 
          Stensland further testified that, later that evening, Deputy Elkins asked him to
pick up Teer in a patrol car and bring her to the location where Elkins was meeting 
with appellant. At the meeting, Stensland directed his patrol car’s take-down lights,
light-bar lights, and headlights at appellant so that appellant would not be able to see
Teer sitting inside of the patrol car. Stensland testified that, when Elkins approached
Stensland’s patrol car and stuck his head in the window, Teer told Elkins that
appellant was the driver of the car that had struck the F-150 truck and then left the
collision scene in a truck. 
          Precinct Four Deputy Constable R. Caldwell testified that, on May 18, 2003,
at about 11:00 a.m., after receiving a call from appellant, he met with appellant. 
Appellant told Caldwell that, at 11:00 p.m. on May 17, 2003, he had parked his car
at a convenience store located at the intersection of Treschwig and Cypress Wood
streets, that a friend then picked him up, that they hung out in the “spring creek area,”
and that he spent the night at his friend’s house. Appellant also told Caldwell that,
when he returned to the convenience store at 11:00 a.m. on May 18, 2003, his car was
no longer in the parking lot. Appellant further told Caldwell that he was aware that
his car had been in an accident the night before, that his car had been towed, and that
he wanted to report his car as stolen from the convenience store located at the
intersection of Treschwig and Cypress Wood. Caldwell noted that the intersection
of Treschwig and Cypress Wood was located about eight miles from Spring Creek
and about four miles from the collision scene. Caldwell explained that, while
speaking with appellant, Caldwell noticed that appellant had a one-quarter-of-an-inch
laceration under his left eye. Appellant told Caldwell that he had received the cut
during a fight the night before. 
Sufficiency of the Evidence
          In his sole issue, appellant argues that the evidence was factually insufficient
to support his conviction because “the evidence that [a]ppellant was the driver of the
car which struck the complainants was so obviously weak as to undermine confidence
in the jury’s determination of [a]ppellant’s guilt.”
            In our review of the factual sufficiency of the evidence, we view all of the
evidence neutrally, not in the light most favorable to the verdict, and we will set aside
the verdict “only if the evidence is so weak that the verdict is clearly wrong and
manifestly unjust, or the contrary evidence is so strong that the standard of proof
beyond a reasonable doubt could not have been met.” Escamilla v. State, 143 S.W.3d
814, 817 (Tex. Crim. App. 2004) (citing Zuniga v. State, 144 S.W.3d 477, 483 (Tex.
Crim. App. 2004)). We must not substitute our judgment for that of the fact finder.
Zuniga, 144 S.W.3d at 482. Although our analysis considers all the evidence
presented at trial, we note that the trier of fact is the exclusive judge of the facts, the
credibility of the witnesses, and the weight to be given to their testimony. Sharp v.
State, 707 S .W.2d 611, 614 (Tex. Crim. App. 1986); Jaggers v. State, 125 S.W.3d
661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d). Unless the available
record clearly reveals that a different result is appropriate, an appellate court must
defer to the jury’s determination concerning what weight to give contradictory
testimonial evidence because this resolution often turns on an evaluation of the
credibility and demeanor of the witnesses, and the jurors were in attendance when the
testimony was delivered. Johnson v. State, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000). 
            A person commits the offense of failure to stop and render aid if the person
does not stop and comply with the requirements of Transportation Code section
550.021. Tex. Transp. Code Ann. § 550.021(c) (Vernon 1999). Section 550.021(a)
provides the following:
The operator of a vehicle involved in an accident resulting in injury to
or death of a person shall: (1) immediately stop the vehicle at the scene
of the accident or as close to the scene as possible; (2) immediately
return to the scene of the accident if the vehicle is not stopped at the
scene of the accident; and (3) remain at the scene of the accident until
the operator complies with the requirements of Section 550.023.



Id. § 550.021(a). The culpable mental state required for the offense of failure to stop
and render aid is that the accused had knowledge of the circumstances surrounding
his conduct, meaning that the defendant had knowledge that an accident had occurred. 
Goss v. State, 582 S.W.2d 782, 785 (Tex. Crim. App. 1979).
          In support of his argument that the evidence was factually insufficient to
support his conviction, appellant relies on Ward v. State, 48 S.W.3d 383 (Tex.
App.—Waco 2001, pet. ref’d). In Ward, the complainant, a delivery-truck driver, was
robbed in a convenience store parking lot by a black male who was wearing a tan
sports jacket, no shirt, and a plastic cap with a baseball cap over it and who had been
loitering in the store’s parking lot. Id. at 385. A customer who had driven up to the
store right after the robbery testified that he saw a man running away from the store
and identified him as a man who was not the defendant. Id. Furthermore, four of the
defendant’s co-workers testified that he was at work on the day of the robbery. Id.
at 386. However, at trial, the complainant, another truck driver, and a store employee
testified that the defendant was, in fact, the robber. Id. The jury found the defendant
guilty of the offense of aggravated robbery. Id. at 387. However, the Waco Court of
Appeals held that the evidence was factually insufficient to support the defendant’s
conviction because, based on the evidence as a whole, the “conviction [was] clearly
wrong and manifestly unjust.” Id. at 391. In reaching its holding, the court noted that 
the probability [that] the events occurred as the State alleges is very low. 
For one, the time line necessary for [the defendant] to have committed
the robbery requires almost split-second timing. Furthermore, a number
of events do not make sense, such as why [the defendant] would wave
at Jones, and why he would take off his shirt. Also, two of the State’s
three eyewitnesses observed the robber for only a brief period of time,
and the third was under medication for a mental condition. There also
was discrepant testimony from these witnesses about a mark on the
robber’s face. In addition, the photographic lineup procedures used by
the police are suspect. Finally, the State put on no physical evidence
linking [the defendant] to the crime, and asserted no motive why a
hardworking family man would commit the crime. 
 
At the same time, the sizeable evidence contrary to guilt cannot be
resolved. The State never effectively challenged [the defendant’s] alibi
defense, which consisted of not only three witnesses who placed him at
work at the time of the robbery, but also of documentary evidence, his
machine-stamped time card, which also placed him at work during the
robbery, and on which were stamped times which corresponded to the
times given by co-workers about when they spoke to [the defendant] at
work. This evidence cannot simply be ignored. In addition, there was
a plausible alternate suspect, Lewis, whom the police never interviewed,
even though an eyewitness specifically identified him as the robber.
 
Id. at 391.
 
          Appellant argues that, as in Ward, the evidence in the instant cause was
factually insufficient to support the jury’s implied finding that appellant was the
driver of the car that struck the complainants’ F-150 truck because (1) Teer was the
only witness who identified appellant as the person who struck the F-150 truck;
(2) Teer “caught only a quick glimpse of the person leaving the vehicle which had
just collided with them an[d] enter another car”; (3) Teer’s “observation was at most
fleeting”; (4) “[t]he circumstances of [Teer’s] identification of [a]ppellant to Deputy
Elkins was [sic] extremely suspect”; (5) “Elkins testified that the vehicle plates came
back to [a]ppellant, which would only tend to indicate that [a]ppellant owned the car,
not that he was necessarily driving”; and (6) “[a]ppellant had reported that his car had
been stolen.” 
          Here, however, there is ample evidence that appellant was the driver of the gray
Dodge Stratus that hit the complainants’ F-150 truck. Unlike in Ward, no witness 
testified that appellant was at another location at the time of the collision, no witness
testified that another plausible suspect existed, and there was no discrepant testimony
regarding the identity of the driver of the gray Dodge Stratus who left the accident
scene. Rather, Teer testified that, immediately after the F-150 truck was hit from
behind, she saw the “gray Dodge” pull into the gas station’s parking lot, saw the
driver exit the “gray Dodge,” and saw the driver get into a red-and-white truck that
drove away from the collision scene. Teer also identified appellant as the driver of
the “gray Dodge” later the next night while sitting in Deputy Stensland’s patrol car
and during the trial. Henderson testified that, after her F-150 truck was hit twice, she
saw “a Dodge Stratus or something” pass the F-150 truck and drive into the gas
station’s parking lot and that the Dodge Stratus’s license plate was embedded in the
F-150 truck’s trailer. Deputy Elkins testified that, after finding the Dodge Stratus’s
license plate embedded in the F-150 truck’s trailer, a license-plate check showed that
appellant owned the damaged Dodge Stratus. Deputy Caldwell testified that he found
appellant walking down a street that was located three to four miles from the accident
scene only a few hours after the accident had occurred. Elkins testified that the
Dodge Stratus had extensive front-end damage, and both Elkins and Caldwell
testified that appellant had a laceration below his left eye. 
          Furthermore, although Deputy Stensland, Deputy Caldwell, and Deputy Elkins
testified that appellant told them that his car had been stolen the night of May 17,
2003, appellant provided three different accounts of how and from where his car was
allegedly stolen. Appellant first told Stensland that he had been at Spring Creek
“drinking a few beers with his friends and [that] some unidentified people jumped
him, fought with him and then took his car.” Then, appellant told Caldwell that his
car had been stolen at about 11:00 p.m. on May 17, 2003, from the parking lot of a
convenience store located at the intersection of Treschwig and Cypress Wood streets,
which Caldwell testified was located about eight miles from Spring Creek. Caldwell
further testified that appellant also told him that appellant was aware that his car had
been in an accident on the night of May 17, 2003, and that his car had been towed. 
Finally, Elkins testified that appellant told him that appellant remembered leaving a
friend’s house, driving down Aldine Westfield street, and then parking his car in the
gas station’s parking lot on Aldine Westfield street. Moreover, appellant told Elkins
that, although “he did not remember the accident,” “he may have been driving the
vehicle when the accident occurred.” 
          Considering this evidence, as the exclusive judges of the facts, the credibility
of the witnesses, and the weight to be given their testimony, the jury was free to
believe or disbelieve all or any part of the State’s witnesses’ testimony. McKinny v.
State, 76 S.W.3d 463, 468-69 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Again,
the jury, as the fact finder, is the sole judge of the weight and credibility given to
witness testimony, and, when reviewing the evidence, we must not substitute our
judgment for that of the fact finder. Johnson, 23 S.W.3d at 7. Viewing all of this
evidence neutrally, we conclude that the evidence was not so weak that the verdict
was clearly wrong or manifestly unjust and that the contrary evidence was not so
strong that the standard of proof beyond a reasonable doubt could not have been met. 
Accordingly, we hold that the evidence was factually sufficient to support appellant’s
conviction for the offense of failure to stop and render aid.
          We overrule appellant’s sole point of error. 
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice
Panel consists of Chief Justice Radack and Justices Jennings and Hanks.
Do not publish. Tex. R. App. P. 47.2(b).