Dennis J. JAGGERS, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–02–00725–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 4, 2003.

James M. Leitner, Houston, TX, for Appellant.

Dan McCrory, Assistant District Attorney, Houston, TX, Charles A. Rosenthal, Jr., District Attorney–Harris County, Houston, TX, for Appellee.

Panel consists of Justices HEDGES, NUCHIA, and HIGLEY.

## OPINION

SAM NUCHIA, Justice.

Appellant, Dennis J. Jaggers, was charged by indictment with murder. A jury found appellant guilty and sentenced him to 99 years confinement. In 12 points of error, appellant contends that the trial court committed reversible error. We affirm.

## BACKGROUND

On April 26, 1999, Peggy Moore attempted to pick up Barbara Stewart for work at a previously agreed upon time. When she arrived at the Houston Motor Inn, where Barbara and appellant were staying, she saw appellant standing outside their room. Appellant was Barbara's ex-boyfriend. Appellant told Moore that she was late and that Barbara had already left. Moore, at trial, testified, "[Appellant] added that Barbara had got her money and she got what she deserved." Barbara did not come to work on the 26th and has not been seen since.

Witnesses at trial testified that appellant had assaulted Barbara several times. Melissa Stewart, Barbara's daughter, testified that the relationship would best be described as violent and testified about an incident in which appellant threatened to kill her and Barbara. Lisa Harber, the manager of the club where Barbara worked, testified about one occasion in which Barbara came to work after being assaulted by appellant. Appellant lived with Steven Broussard from December 1998 until March 1999. Broussard testified that when appellant lived with him, appellant would complain that Barbara was with another man and would often talk about killing her.

In early May 1999, appellant called Sherry Ann Zoch and asked for a ride to the bus station. They met at the Houston Motor Inn. Appellant told Zoch that Barbara was out with her new boyfriend and that he wished to leave before she got back. Appellant told Zoch that first they

needed to dispose of a wicker basket because it had garbage in it. Zoch testified that the room was messy and smelled strange. Appellant said he did not wish to dispose of the basket in the dumpster at the hotel, instead taking the basket to Zoch's truck and directing her to a dumpster about a five minute drive away. Zoch testified that the basket was large enough to hold a woman's body, but she did not look inside the basket. After appellant disposed of the basket, Zoch took him to the bus station.

Appellant went to Arlington to stay at his mother's house. His mother testified that she kicked appellant out of the house roughly three months after he arrived. She stated that appellant called her between Christmas and New Year's Day of the next year and said, "Well, how does it feel to know you've spawned a murderer?"[1]

Several months after appellant left Houston, he returned and called Zoch to inform her that he was back in Houston. During appellant's conversation with Zoch, he informed her that Barbara was missing and, when Zoch said she didn't care, said "Well you should care.... I killed Barbara. What do you think was in that basket?" Appellant later retracted this statement, telling Zoch that he was kidding and that the basket contained stereo equipment.

Officer Michael Ybanez and Officer David Ferguson of the Houston Police Department Homicide Division were given the case of Barbara's disappearance when it was transferred from the missing persons department at the end of 1999. Ybanez located appellant at a men's shelter on January 2, 2000. Ybanez and appellant went to the police station and appellant gave a written statement in which he claimed that he did not kill Barbara and that he last saw her when he visited her at the club before he went to Arlington.

On September 6, 2000, appellant was arrested by Officers Salinas and McCreary for theft from a men's shelter. Salinas asked appellant why he took the money. Appellant did not answer that question, but asked to speak to Ybanez about a homicide. Appellant was read his *Miranda* warnings.[2] Appellant then stated that he wanted to sign something at the meeting with Ybanez and wished to have an attorney there at the meeting. Appellant, without prompting, said that it was about a girl whose body was thrown in a dumpster. Appellant was taken to the police station. Ybanez was informed that appellant was in jail and wanted to talk to him. Neither Salinas nor McCreary informed Ybanez that appellant requested that an attorney be at the meeting.

Ferguson went to the jail and took appellant out to be interviewed. At his interview with Ybanez, appellant was again read his *Miranda* rights. Appellant stated that he understood his rights and then asked if Ybanez thought he needed an attorney. Ybanez replied that appellant would have to make that decision for himself. Appellant did not ask for an attorney and made an audiotape-recorded statement. In this statement, appellant claimed that he and Barbara entered into a suicide pact to overdose on cocaine because they both believed they had AIDS. Appellant said he held Barbara's arm while she injected herself with the initial dose. Barbara started "flopping around"

---

1. Appellant's mother was unsure if the word used was "murderer" or "killer."

2. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). *See also*, Tex Code Crim. Proc. Ann. art. 38.22 (Vernon 1979 & Supp.2003).

after this dose, so appellant injected her with a second dose of cocaine, after which she died. Appellant stated that he "OD'ed" her, but that Barbara had told him to make sure she died. Appellant also said that he placed Barbara's body in the wicker basket and had Zoch give him a ride to the dumpster where he disposed of it.

## DISCUSSION

Appellant's twelve point of errors fall into four categories: (1) the admissibility of the audiotape, (2) the State's actions to prove the corpus delicti, (3) objections to extraneous offense and hearsay evidence, and (4) the legal and factual sufficiency of the evidence.

### I. Audiotape Admissibility

#### Voluntariness of Statement

Appellant, in his first point of error, contends that his in-custody statement, which included a confession to the murder, was involuntary and should have been suppressed. Appellant filed a pretrial motion to suppress his statement and the trial judge conducted a hearing on the motion. The hearing consisted of the testimony of the four police officers involved in his arrest and the taking of his statement. The judge filed findings of fact and conclusions of law and denied the motion.

■ We review a trial court's ruling on a motion to suppress evidence for abuse of discretion. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996); *Taylor v. State*, 945 S.W.2d 295, 297 (Tex. App.-Houston [1st Dist.] 1997, pet. ref'd). A confession is admissible if the confession was freely and voluntarily made. TEX. CODE CRIM. PROC. ANN. art. 38.21 (Vernon 2003). In reviewing the voluntariness of a confession on appeal, almost total deference is given to the trial court's determina-

tion of historical facts in a suppression hearing. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App.2000). At a hearing to suppress evidence, the trial court is the sole judge of the weight and credibility of the evidence; the trial court's finding may not be disturbed on appeal absent a clear abuse of discretion. *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex.Crim.App.1993). Before we can determine that appellant's confession was involuntary, we must conclude that appellant was unable to make an independent, informed choice of free will at the time the confessions were made. *See Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim.App.1996). In reviewing a ruling on a question of application of law to facts, we review the evidence in the light most favorable to the trial court's ruling. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim. App.1997).

■ During the motion to suppress, Ferguson testified that when appellant gave his statement, he was coherent, answered yes to indicate that he understood his rights, and asked whether the officers thought he needed an attorney. He was able to speak and to act coherently as well as to ask informed questions. Although appellant appeared to be depressed, Ferguson testified that he attributed appellant's frame of mind at that time to a guilty conscience.

Appellant argues that his statement was involuntary because he was "severely depressed and suicidal" when he made the audiotape-recorded statement and that thus his statement was not a product of a free will and rational intellect. As evidence of this, appellant refers to his statements that he wanted a guarantee he would go straight to death row and that he wished to waive all appeals on his behalf. He also points to Ferguson's testimony that he had appellant put on suicide watch in the jail.

As the United States Supreme Court has so aptly stated, "[A] confession made by a person in custody is not always the result of an overborne will. The police may be midwife to a declaration naturally born of remorse, or relief, or desperation...." *Martinez v. State,* 656 S.W.2d 157, 163 (Tex.App.-San Antonio 1983, pet. ref'd) (quoting *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). The aforementioned testimony is evidence that the confession in this case was the result of a remorseful state of mind rather than an overborne will.

It is clear from the record that the trial judge heard all of this testimony and more during the suppression hearing. Giving almost total deference to the determination of these historical facts, we find no clear abuse of discretion in her finding that the confession was voluntary. We overrule appellant's first point of error.

### Right to Counsel

In his second point of error, appellant contends that the trial court erred in failing to suppress the audiotape of his confession because appellant had invoked his right to counsel.

While appellant was being transported back to the men's shelter after the theft for identification by a witness, he informed Salinas and McCreary that he would like to speak to Ybanez about a murder. McCreary testified:

> He only mentioned the lawyer once whenever he said to get a hold of [Ybanez] that "I want to sign something, get something off my chest. I can't live with it. And I need to get a lawyer there at that meeting for"—for whatever he signed, whatever he was going to sign. That's the only time he mentioned the lawyer at all.

Appellant was then read his *Miranda* rights. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *see also* TEX.CODE CRIM. PROC. ANN. art. 38.22 (Vernon 1979 & Supp.2003). McCreary testified that, after appellant's *Miranda* rights were read, appellant again stated that he needed to talk to Ybanez. McCreary further testified that appellant vaguely stated that it was about a murder and about a girl; "I (McCreary) think a dancer or something ... her body was thrown in a dumpster or something."

Appellant was not being questioned about the murder at this time and these statements were volunteered to the officers. Appellant did not, at this point, indicate why he wished to have an attorney at the meeting with the homicide detectives, but mentioned the lawyer only in connection with meeting with Ybanez, stating, "I want to sign something, get something off my chest. I can't live with it. And I need to get a lawyer at that meeting for...."

McCreary testified, in response to a question by the court, that he didn't know whether appellant was going to talk about whether he was involved in a murder or was a witness to a murder. McCreary also testified, in response to another question by the court, that appellant did not indicate why he wanted a lawyer at his meeting with Ybanez and that appellant merely said that he wanted to have the lawyer at the meeting with homicide.

Ybanez was not informed about appellant's request that a lawyer be present at the meeting. When appellant asked Ybanez, prior to questioning, if he needed a lawyer, Ybanez responded that appellant would have to make that decision for himself. Ybanez read appellant his *Miranda* warnings at that point, and appellant responded that he understood his rights and still wished to speak to Ybanez. Appellant did not request a lawyer again at this time and made his statement without further requests.

■ Appellant argues that he properly invoked his Fifth Amendment right to counsel. However, the Fifth Amendment right to counsel must be affirmatively invoked and also must be invoked in regard to a specific crime. *See Cobb v. State,* 85 S.W.3d 258, 264 (Tex.Crim.App.2002).

■ McCreary and Salinas testified that appellant did not tell them why he wished to have a lawyer present at his meeting with Ybanez. Appellant gave no clear indication of what he wanted to do at that meeting. Although appellant did ask for a lawyer at his meeting with Ybanez, he did not invoke this right in relation to a specific crime. Although this court, with appellant's confession in the record, may understand why appellant desired a lawyer at the meeting, an officer at the time of appellant's request could not know that appellant was invoking his Fifth Amendment right to counsel because he wanted to confess to Barbara's murder.

■ The ambiguous nature of an appellant's statement allows for interrogation to continue for the purpose of determining whether the accused wants to consult with counsel or wishes to proceed without benefit of counsel. *Hicks v. State,* 860 S.W.2d 419, 430 (Tex.Crim.App.1993). In this case, appellant's invocation was ambiguous, at least as to what he wanted to do at the meeting with Ybanez. It was appropriate for Ybanez to ask appellant if he wanted to talk with him. Once appellant confirmed that he wanted to talk to Ybanez, and being read his *Miranda* warnings again, waived those rights, Ybanez could properly proceed to ask him questions.[3] We overrule appellant's second point of error.

3. We also note that the act of administering the *Miranda* warnings is itself the primary protection of suspects subject to custodial interrogation. *See Cobb v. State,* 85 S.W.3d

## II. Corpus Delicti

In his third point of error, appellant contends that the evidence is insufficient to support his conviction for murder, as the State failed to prove the corpus delicti independent of his out-of-court statements. Appellant argues that, as the body of the victim was never recovered, the only evidence that the complainant is dead is her failure to maintain her work schedule and her failure to keep in contact with friends and family. Appellant further contends that, because appellant's body was never recovered, the manner and means of death cannot be established as criminal in nature.

■ A criminal conviction cannot be based upon a defendant's extrajudicial confession unless the confession is corroborated by independent evidence tending to establish the corpus delicti. *Fisher v. State,* 851 S.W.2d 298, 302 (Tex.Crim.App.1993). The corroborating evidence need not prove the underlying offense conclusively; there just must be some evidence which renders the commission of the offense more probable than it would be without the evidence. *Cardenas v. State,* 30 S.W.3d 384, 390 (Tex.Crim.App.2000).

■ In the instant case, there is evidence tending to prove the underlying corpus delicti. Barbara disappeared suddenly, without cleaning out her locker at work, or informing friends or family. Her daughter, Melissa, testified that she was unable to contact her mother starting in April of 1999. Previously, they had spoken regularly, sometimes calling each other once a week. Barbara did not call Melissa on her birthday or holidays after that April, when she had always done so

258, 263 (Tex.Crim.App.2002). Full comprehension of the rights included in those warnings is sufficient to dispel whatever coercion is inherent in the interrogation process. *Id.*

before. Barbara's car was inoperable in late April and she was apparently low on funds, making it unlikely that she had traveled. Witnesses testified that Barbara was in a good relationship with a new boyfriend and was happy. These facts suggest that Barbara's disappearance was not voluntary, thus suggesting that foul play may have been involved in her disappearance.

In addition, both Broussard and Zoch testified that appellant had expressed anger toward Barbara, stating that he wanted to kill her. Several witnesses testified that appellant and Barbara had a violent history. There was testimony that appellant had choked, shot, beaten, and threatened to kill her at various times. Appellant lived in a hotel room with Barbara at the time of her disappearance. Zoch testified that appellant acted oddly with regard to the disposal of a wicker basket, not wanting to throw it away in the dumpster at the hotel and directing Zoch to a dumpster some distance away from the hotel. Further, appellant's statement to Zoch that he had killed Barbara and his statement to his mother about being a murderer supported the State's case.

There is sufficient evidence in addition to appellant's statements and confessions that Barbara was murdered by appellant. The evidence was sufficient for a rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt, and the evidence is not so weak as to be manifestly unjust or against the great weight and preponderance of the available evidence. We overrule appellant's third point of error.

### III. Evidentiary Objections

In his fourth, sixth, and eighth points of error, appellant claims that the trial court committed error by allowing testimony by Melissa Stewart, on points of error four

and six, and testimony by Lisa Harber on point of error eight, because this testimony was regarding extraneous offenses that did not relate to any issue in the case.

 An appellate court reviews a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Burden v. State*, 55 S.W.3d 608, 615 (Tex.Crim.App.2001). An appellate court will not reverse a trial court's ruling unless the ruling falls outside the zone of reasonable disagreement. *Id.* Article 38.36(a) of the Texas Code of Criminal Procedure allows the State or defendant to offer testimony to all relevant facts and circumstances surrounding the killing and the previous relationship between the accused and the deceased, along with all relevant facts and circumstances going to show the state of mind of the accused at the time of the offense. Tex.Code Crim. Proc. Ann. art. 38.36(a) (Vernon 2003). However, the testimony allowed under this article would still be subject to rules 403 and 404 of the Texas Rules of Evidence. *Smith v. State*, 5 S.W.3d 673, 679 (Tex.Crim.App.1999).

### *Extraneous Offense Testimony*

 In his fourth, sixth, and eighth points of error, appellant complains that the trial court admitted, over objection, Melissa Stewart's testimony that Barbara told Melissa that appellant had shot at her and that appellant had threatened to kill both Barbara and Melissa with a knife, and Lisa Harber's testimony that Barbara told Harber that appellant had tried to kill her. This testimony does refer to offenses extraneous to the one at issue. However, this evidence also tends to show that appellant was hostile toward the victim and had acted violently toward the victim in the past. These incidents of hostility are circumstantial evidence of appellant's state of mind. Also, the testimony regarding these incidents is circumstantial evidence

supporting the corpus delicti of the crime. This evidence was admissible under article 38.36(a) as it tends to establish appellant's state of mind and the relationship between the accused and the deceased. We overrule appellant's fourth, sixth, and eighth points of error.

### Rule 403 Objections

Appellant, in his fifth, seventh, and ninth points of error, claims that the trial court committed reversible error in overruling his objections to (1) the testimony by Melissa Stewart regarding appellant's extraneous acts, and (2) testimony by Lisa Harber regarding appellant's extraneous acts because the probative value of the evidence was substantially outweighed by the risk of unfair prejudice, undue delay, and confusion of the issues relevant to the case.

An extraneous offense is not admissible unless its probative value substantially outweighs its unfair prejudicial effect. TEX.R. EVID. 403; see Montgomery v. State, 810 S.W.2d 372, 386–87 (Tex.Crim. App.1990). In determining whether the prejudicial effect of evidence substantially outweighs its probative value, several factors must be considered: (1) how compellingly the evidence serves to make more or less probable a fact of consequence, (2) the potential the evidence has to impress the jury in some irrational but indelible way, (3) how much trial time the proponent needs to develop the evidence, and (4) how great is the proponent's need for the evidence. See Montgomery, 810 S.W.2d at 389, 390.

Melissa's and Harber's testimony must be considered in relation to the four factors set out in Montgomery to determine whether it is more prejudicial than probative. In regard to the first factor, whether the testimony makes a fact of consequence more or less probable, this testimony is clearly valuable. The testimony concerned several assaults upon Barbara by appellant, each assault being a separate incident. This testimony would make the State's argument that appellant had motive and intent to harm Barbara much more credible because the testimony would show that appellant had caused harm to Barbara previously. The testimony, as we noted previously, also supports the establishment of the corpus delicti. In regard to the second factor, that the jury not be affected in some irrational yet indelible manner, the court gave a limiting instruction in the jury charge that informed the jurors that evidence of extraneous offenses could only be considered for the issue of intent. There is no indication in the record that a jury would be affected in an irrational manner or would otherwise disregard the court's instruction. In regard to the third factor, little time was required for the introduction of this evidence. Finally, for the fourth factor, the State's need for this evidence was significant. Although, as appellant states in relation to his fifth and ninth points of error, the State did not establish that these actions were close in time to the murder and neither Melissa nor Harber actually saw the incidents about which they would testify, this evidence was still important to the State as it illustrated appellant's violent relationship with Barbara and his motive and intent to kill her. While the State had other evidence tending to show appellant's violence, motive, and intent, such as the testimony from Zoch and Broussard that appellant had talked about killing Barbara, testimony that he had, in fact, assaulted her lent credence to the State's argument. We hold that the trial court did not abuse its discretion in allowing Melissa's and Harber's testimony. We overrule appellant's fifth, seventh, and ninth points of error.

## Hearsay

■ In his tenth point of error, appellant contends that the trial court erred in admitting Lisa Harber's testimony that Barbara had told her, "I thought he [appellant] was going to kill me," because the statement was inadmissible hearsay. The trial court admitted this testimony under the excited-utterance exception after hearing the testimony outside of the presence of the jury. *See* Tex.R. Evid. 803(2). Harber testified that, upon seeing Barbara's injuries, she asked Barbara, "What happened?" Harber stated that, after she asked this question, Barbara broke down and started crying while telling Harber, "I thought he [appellant] was going to kill me."

Appellant suggests that Barbara's statement could not be admissible under the excited-utterance exception to hearsay because she only stated that appellant had tried to kill her in response to the questioning of Lisa and some of the other dancers and that a statement is not admissible under the excited utterance rule if it is the product of reason and reflection, rather than impulse.

While Harber had no knowledge of when the actual assault occurred, the trial court found that the assault had occurred within the past 16 hours, since Barbara had left work without injury at that time.

■ Hearsay is not admissible except as provided for in one of the hearsay exceptions. Tex.R. Evid. 802. An excited utterance, which is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition, is not excluded by the hearsay rule. Tex.R. Evid. 803(2). "The basis for the excited utterance exception is 'a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the "truth will come out." ' " *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex.Crim.App.2003). The critical factor in determining whether an exclamation is an excited utterance is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event or condition at the time of the statement." *Id.* at 596. The length of time between the incident and the utterance and whether the utterance was made in response to questioning are only factors in the determination of whether a statement was an excited utterance and are not necessarily dispositive. *Id.* at 595–96.

Based on the circumstances described by Harber, we hold that the trial court did not abuse its discretion in finding that Barbara was still dominated by the emotions, fear, or pain of the event or condition when she made her statement. We overrule appellant's tenth point of error.

## IV. Legal and Factual Sufficiency

In his eleventh and twelfth points of error, appellant contends that the evidence was legally and factually insufficient to support appellant's conviction for murder because the State failed to prove that appellant intended to cause Barbara's death or to commit an act clearly dangerous to Barbara's life.

■ In reviewing the evidence on legal sufficiency grounds, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App.2000). In reviewing the evidence on factual sufficiency grounds, all of the evidence as a whole must be reviewed, and not in the light most favorable to the prosecution. *Clewis*

*v. State,* 922 S.W.2d 126, 129 (Tex.Crim. App.1996). After reviewing the evidence, the evidence will not be deemed factually insufficient unless (1) it is so weak as to be clearly wrong and manifestly unjust or (2) the adverse finding is against the great weight and preponderance of the available evidence. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App.2000). However, in a factual sufficiency review, the appellate court should not substitute its own judgment for that of the fact finder. *Jones v. State,* 944 S.W.2d 642, 648 (Tex.Crim.App.1996). Under both legal and factual sufficiency, the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Penagraph v. State,* 623 S.W.2d 341, 343 (Tex.Crim.App.1981).

■ The State charged appellant with the offense of murder, alleging either that appellant intended to cause Barbara's death or to cause her serious bodily harm. Appellant contends that the evidence was only sufficient to show that appellant intended to assist Barbara in using cocaine or to help her commit suicide.

In appellant's tape-recorded confession, he states that he and Barbara agreed to commit suicide together by overdosing on cocaine. Appellant held Barbara's arm while she injected herself with cocaine. Following this first injection, Barbara started flopping around and appellant gave her a second shot of cocaine. Appellant stated that, after this second shot, "she was for sure was dead ..." and that he had "OD'ed" her. Appellant stated that Barbara had told him to make sure she was dead.

A factfinder could find that appellant intentionally caused Barbara's death by giving her a second dose of cocaine after it was clear that the first one had not killed her. His statements that he "OD'ed" her, and his statements to others, such as Zoch

and his mother about killing Barbara support that conclusion. Further, the testimony showed he had motive and intent to kill Barbara, as well as a violent history toward her. We conclude that the evidence was sufficient for a rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. The evidence is not so weak as to be manifestly unjust or against the great weight and preponderance of the available evidence. We overrule appellant's eleventh and twelfth points of error.

## CONCLUSION

We affirm the judgment of the trial court.